## THE CITY OF CHICAGO

*v.*

## PATRICK J. SEXTON.

*Filed at Ottawa September 21, 1885.*

1. BUILDING CONTRACT—*declaration of forfeiture—right reserved in the contract—its character and extent.* A contract entered into between a city and a building contractor, "to furnish, deliver, set up, place and fix, complete, all the iron work required in the erection of a building for a city hall," etc., for a given sum, made up by stating the estimated cost of each story and the roof separately, to be paid when the contract should be completed, with payments on estimates as the work progressed, on condition that the progress of the work should be satisfactory, reserving fifteen per cent thereof until the completion of the contract, contained a clause that if the work should not be commenced in the time stipulated, or should not make such progress as to insure its completion in the time agreed upon, or if the work should be wholly or in part improperly constructed, the mayor, on behalf of the city, might declare the contract forfeited, either as to a portion or the whole of said work, etc., and provided that such declaration of forfeiture should not relieve the contractor from the covenants and conditions of the contract: *Held,* that the power to declare a forfeiture was not an arbitrary one, to be exercised capriciously, but could be exercised only in good faith and for reasonable cause, and further, that the contract was an entire one in its character, and the power was not limited to stories of the building, but might be exercised as to a part of the work on a given story as well as for the whole of the work on a story.

2. SAME—*unauthorized declaration of forfeiture—measure of recovery for work already done.* Where a contractor is prevented from completing his contract by an unauthorized declaration of a forfeiture, the value of the work done and materials furnished by him under the contract must be fixed by the stipulations of that contract, so far as they can be applied; and he can not proceed upon a *quantum meruit* and *quantum valebant*, in disregard of the special contract.

3. ESTOPPEL—*when applied to municipal corporation.* A municipal corporation may be estopped by the action of its proper officers, when the corporation is acting in its private, as contradistinguished from *its govern-mental,* capacity, and has lawful power to do the act.

4. SAME—*as to what.were the plans and specifications for a public building.* A city, having power to contract for the building of a city hall, advertised for bids for furnishing materials and doing the work in accordance with plans and specifications on file in the department of public works, and the party whose bid was accepted, was shown, by one in charge of the office of public works, certain plans call "tracings," but which were in fact not the original plans, upon which to make his estimates and bid, and his contract referred to plans and specifications in such office. It was *held,* that the plans and specifications so shown him were the ones referred to in the contract, and that the city was estopped, by the action of its agent in charge of the office, from denying that the plans and specifications so shown to him were the ones adopted for the work, and insisting that the contract related to other and different ones, which would make a considerable difference in the value and cost of the work.

5. MUNICIPAL INDEBTEDNESS—*constitutional limitation—distinguished as to liabiliy incurred from wrongful conduct.* A municipal corporation is responsible for the want of fidelity or negligence of those who are authorized to act for it, and such liability is not within the constitutional and statutory limitation in regard to the creation of indebtedness.

APPEAL from the Appellate Court for the First District;— heard in that court on appeal from the Superior Court of Cook County; the Hon. SIDNEY SMITH, Judge, presiding.

This is assumpsit, by Patrick J. Sexton, against the city of Chicago, brought in the Superior Court of Cook county, for a balance claimed to be due for work done and materials furnished by him, and used and appropriated by the city in the construction of the iron work for the new city hall. The declaration contains the common counts only. The city pleaded non-assumpsit. By agreement of parties, the cause was submitted to the court without the intervention of a jury. The court found in favor of the defendant, and rendered judgment accordingly. That judgment was affirmed on appeal to the Appellate Court for the First District, but on appeal to this court the last named judgment was reversed, and the cause was remanded for a trial *de novo.* Upon being remanded to

the Superior Court, the cause was again submitted to the court without the intervention of a jury, by the agreement of parties, and the court there found and rendered judgment for the plaintiff for $56,680. This judgment was affirmed by the Appellate Court for the First District, on appeal to that court, and that judgment of affirmance is brought before this court for review by the present appeal.

The material facts are: On the 30th of March, 1878, the mayor of the city of Chicago advertised for sealed proposals, to be received by the department of public works, in connection with the committee of the city council on public buildings, for furnishing all the stone, brick and iron, and doing all work necessary in the construction of the new city hall, etc. On the 8th of April, 1878, Patrick J. Sexton, in response to this advertisement, addressed to the department of public works and building committee of the city of Chicago, sealed proposals to furnish all the materials and do all the work for the iron work, complete, in the construction of the new city hall to be erected on the west half of block 39, original town of Chicago. For basement, $15,400; for first story, $17,300; for second and third stories, $35,000; for fourth story, with sky-light and roof, $36,602.69,—$105,302.69,—complete, according to their advertisements inviting proposals for the same, and according to the plans and specifications on file in the department of public works of the city of Chicago, for the sum of $105,302.69. This was accompanied, as was required by the advertisement for the proposals, by a bond, indorsed on the proposals, for $1000, conditioned upon the performance and execution by said Sexton of said work or delivery of said materials or supplies according to his proposals, and the execution of a contract therefor. The proposals were accepted, and on the 17th of April, 1878, a contract in writing was entered into, so much whereof as is deemed pertinent to the questions involved in the present litigation being as follows:

"This agreement, made and concluded this 17th day of April, A. D. 1878, between P. J. Sexton, builder, party of the first part, and the city of Chicago, of the second part:

"Witnesseth, that the party of the first part, for and in consideration of the payments to be made by the said city of Chicago, as hereinafter set forth, hereby covenants and agrees to furnish, deliver, set up, place and fix complete all the iron work required in the erection of a building for a city hall, including columns, floor beams, girders, roof-frame and sky-lights, and all other wrought and cast iron or other iron work, as set forth in the plans, diagrams and specifications made and prepared for said work, hereinafter more particularly referred to. Said work to be done in accordance with plans prepared for the doing of the same, on file in the office of the department of public works of said city, and with the specifi-cations appended hereto and made a part of this contract, said work to be commenced on or before the 1st day of May, A. D. 1878, to progress regularly and uninterruptedly after it shall have been begun, excepting as shall be otherwise or-dered by said department, and be finished and fully completed on or before the first day of January, A. D. 1881, time of commencement, rate of progress, and time of completion be-ing essential conditions of this contract. * * * Should the mayor, in charge of the department of public works, deem it proper or necessary, in the execution of the work, to make any alterations which shall increase or diminish the expense, such alterations shall not vitiate or annul the contract or agreement hereby entered into.

"And the said party of the first part covenants and agrees to perform said work under the immediate direction and su-perintendence of the mayor of the city of Chicago, and to his entire satisfaction, approval and acceptance. All material used and all labor performed shall be subject to the inspection and the approval or rejection of said mayor; and the said city of Chicago hereby reserves to its mayor the right finally

to decide all questions arising as to the proper performance of said work, and as to whether the rate of progress thereon is such as to correspond with the conditions of this contract; and if said work shall not be begun at the time herein stipulated, or if the rate at which said work shall be performed shall not, in the judgment of said mayor, be such as to insure its progress and completion in the time and manner herein stipulated, or if said work shall be wholly or in part improperly constructed, then to declare this contract forfeited, either as to a portion or the whole of said work, and to relet the same, or to order the entire reconstruction of said work if improperly done, and in such case of default, or in any case of default, to adjust the difference of damage or price, (if any there be,) which, according to the just and reasonable interpretation of the contract, the said contractor should, in the opinion of said mayor, pay to said city for any failure to properly commence and prosecute, or to properly construct said work in all respects, according to the conditions hereinbefore specified, or for any other default. And it is hereby understood and agreed, that for any amount of damages or price determined by said mayor to be paid to said city by said contractor for any such default, or for any money paid out by said city on account of said contractor in consequence of any default, there shall be applied in payment thereof a like amount of any money that may be due and owing to said party of the first part on account of said work, so far as there may be any such money, and so far as the same shall be sufficient, and if there shall not be a sufficient amount retained from the said party of the first part, then and in such case the amount to be paid to the said city in consequence of such default shall be a just claim against said contractor and his bondsmen.

"In case the said mayor shall deem it necessary to declare any portion or section of such work forfeited, it is hereby expressly stipulated and understood such declaration of for-

feiture shall not in any way relieve the contractor from the covenants and conditions of this contract, but the same shall be and remain valid and binding on said contractor. * * *

"The said city of Chicago hereby covenants and agrees, in consideration of the covenants and agreements in this contract specified to be kept and performed by the said party of the first part, to pay to said party of the first part, when this contract shall be wholly carried out and completed on the part of said contractor, and when said work shall have been accepted by said mayor, the sum of one hundred and five thousand three hundred and two dollars and sixty-nine cents, ($105,302.69,) payment to be made on work actually done on the building, out of any moneys collected by the city for city hall purposes, and duly appropriated and levied for that purpose. * * *

"It is also agreed by said city, that if the rate of progress shall be satisfactory to said mayor, estimates, in the usual form, will be issued to said party of the first part, during the progress of the work, for eighty-five (85) per cent of the value of the work done and in place at the time of issuing of such estimates, the remaining fifteen (15) per cent being reserved until the final completion and acceptance of said work."

The writing was signed by Sexton, and by the members of the committee of the common council on public buildings, and by the mayor, in charge of the department of public works, on behalf of the city.

Evidence was given upon the trial, to the effect that in the office of the department of public works were, at the time, and while the buildings were in progress, what are termed "Specifications of the character of labor and materials required for the iron work for the new city hall," the concluding part of which would seem to have been intended for publication, but which, in fact, never was published, and is, really, a part of the specifications for the iron work, solely. It reads:

"Sealed proposals will be received at the office of the department of public works until April 15, 1878, at 11 A. M., 'for furnishing, delivering, fitting and putting in place the wrought and cast iron work, as is exhibited by the drawings and described in the specifications, consisting of the cast iron columns and wrought iron work of the several stories, roof and ceiling. * * * All of the above named work must be done in a good and workmanlike manner, agreeable to the plan, specifications and details, and to the entire satisfaction of the superintendent, whose interpretation of the same and his decision shall be final and conclusive, as between the city and the contractor. * * * The city reserves the right to reject any or all bids, if it is deemed for the best interest of the city to do so. And any bid that is not made on the printed form to be obtained at this office, and which does not conform in every respect to the requirements of this advertisement, will not be considered."

It was further proved that Sexton was a contractor, and that, noticing the published advertisement, he consulted the plans and specifications in the office of the department of public works, and the architect in charge thereof, for the purpose of estimating upon the iron; that he was referred, by Mr. Cleveland, who was then superintendent of public buildings for the city, to Mr. C. A. Jordan for such information as he might require; that Mr. Jordan was an architect employed as draughtsman in the office of the department of public works; that he was placed in charge of the drawings by Mr. Cleveland, superintendent of public buildings, etc., and by him instructed to give information and instruction to the contractors. For the purpose of enabling Sexton to make estimates upon the iron work then proposed to be let, he and his assistant, as well as others proposing to make bids, were put in possession of certain plans, which in the record are called "tracings," and which related exclusively to the iron work of the building then proposed to be let. These "tracings"

are made upon a semi-transparent paper or cloth, laid over originals, and by drawing upon this paper or cloth the lines and figures appearing through it. There was at the same time in the office, what are termed the "original plans" for the city hall, consisting of many sheets of heavy paper, complicated in their character, and showing the entire building and the various parts of it, in elevation and cross-section.

Sexton obtained his figures and made his estimates from the tracings placed in his possession for that purpose. Various other persons were seeking the same information for the purpose of bidding, and "originals" or "tracings" were used, as was the custom, indiscriminately. The written specifications for the work contain no dimensions. These were placed upon the drawings, in words or figures, which were, so far as they appeared, intelligible to contractors. The tracings from which Sexton's quantities were taken, and upon which his bid for the iron work was based, showed, for rafters for the roof, "T" iron, three and one-half by four inches, weighing seven pounds per foot. It also showed the openings for the sky-lights of the building, and the framework of the roof pertaining thereto, and proper figures representing the dimensions of the framework, but they showed nothing as a superstructure for sky-light purposes; and the evidence showed that Sexton's estimates were based upon this showing of the tracings and the instructions of Jordan. And it was further proved that Sexton was instructed by Jordan, before his proposals were made out, that the plans were not ready for the sky-lights,—that there being no sizes marked on them, he would consequently not include them in his bid; that the iron work to be embraced in the contract was the iron beams for all the stories, the iron columns, or trusses, that support the iron of the ceilings, and the cast iron lintels over the doors, and the "T" irons, and that there were to be omitted from the contract the stair work and all the ornamental work, the railings, and the balustrades and the sky-lights.

Work was commenced by Sexton under the contract, and prosecuted during the balance of the year 1878, the year 1879, and until about September, 1880, but at that time a disagreement arose between Sexton and those representing the city, in regard to the construction of the sky-lights and the weight of the iron rafters to support the roof. The city officials claimed that Sexton's contract included the construction of the iron work for the superstructure of five sky-lights, which would cost about $10,000, and rafters for the roof, weighing ten and one-fourth to thirteen and one-half pounds per lineal foot, and costing from $5,000 to $10,000 more than rafters of similar dimensions weighing only seven pounds per foot. Sexton denied this claim, and contended that the contract did not include the iron work for the superstructure of the sky-lights, and, also, that it only required the rafters for the support of the roof to be of "T" iron, weighing seven pounds per lineal foot. On the 22d of December, 1880, the mayor and commissioner of public works, and superintending architect, declared the contract forfeited as to the roof and sky-lights, because of Sexton's neglect and refusal to furnish the sky-lights and to furnish "T" iron for rafters weighing from ten and a quarter to thirteen and a half pounds per lineal foot, etc., and proceeded to relet the then unfinished iron work for the fourth story and roof, etc.

Mr. F. S. WINSTON, Corporation Counsel, for the appellant:

The contract is made separable, and a declaration of forfeiture as to part of the contract does not disturb the remainder. 2 Parsons on Contracts, *157; 3 id. *187.

The parties have treated it as separable by making bids by stories, and making estimates and settlements by stories, and this construction will govern. *Vermont Street Church* v. *Brose*, 104 Ill. 206; *Garrison* v. *Nute*, 87 id. 215; *Chicago* v. *Sheldon*, 7 Wall. 50.

But if not divisible as to all work done under the contract, prior to the forfeiture, the contract price must govern so far as can be applied. *Brigham* v. *Hawley,* 17 Ill. 38; *Holmes* v. *Stummel,* 24 id. 370; *Evans* v. *Railroad Co.* 26 id. 189; *Dobbins* v. *Higgins,* 78 id. 440; *Folliott* v. *Hunt,* 21 id. 654.

A municipal corporation is not bound by the acts and declarations of its agents or employes, unless clearly within the scope of their authority. *City of Alton* v. *Mulledy,* 21 Ill. 76; *Chicago* v. *Shober Manf. Co.* 6 Bradw. 560; 1 Dillon on Mun. Corp. secs. 445, 447, and cases in note 2.

Mr. LEONARD SWETT, and Mr. JNO. N. JEWETT, for the appellee:

The violation of the contract by the city justified Sexton in treating it as rescinded, after which it became dead for all purposes, and he was entitled to recover the market value of the materials and labor furnished by him. *Huntley* v. *Butts,* 1 Scam. 410; *Herrington* v. *Hubbard,* id. 569; *Read* v. *Phillips,* 4 id. 42; *Bannister* v. *Read,* 1 Gilm. 98; *Hill* v. *Green,* 4 Pick. 114; *Gillett* v. *Maynard,* 5 Johns. 85; *Selby* v. *Hutchinson,* 4 Gilm. 319; *Webster* v. *Enfield,* 5 id. 299; *Schillo* v. *McEwen,* 90 Ill. 79; *Lincoln* v. *Schwartz,* 80 id. 134.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

When this case was before us at a former term, *(Sexton* v. *City of Chicago,* 107 Ill. 323,) the only question considered or decided related to the rule of law applied by the Superior Court to the facts before it in determining what was the contract between Sexton and the city. That court had, in rendering judgment, as the record disclosed, held that the city could not be estopped to deny that the plans and tracings furnished to Sexton by those in charge of the office of the department of public works, upon which to make estimates for his bid or proposals, and, afterwards, to work by, were the

plans for the doing of the work "on file in the office of the department of public works," within the contemplation of the contract. Entertaining this view of the law, the judgment in favor of the defendant logically followed, for, in that view, the contract was properly forfeited to the extent it was so declared, and the evidence disclosed no ground upon which a judgment could be rendered for the plaintiff if he was in the wrong in his construction of the contract. No question, therefore, that might have been pertinent had the Superior Court held that there was ground of recovery sustained by the evidence, was reached. On the trial now brought in review, the Superior Court held, in obedience to the direction of this court in the opinion filed upon reversing the former judgment, that the city was estopped to deny that the plans and tracings furnished to Sexton by those in charge of the office of the department of public works, upon which to make estimates for his bid or proposals, and, afterwards, to work by, were the plans for the doing of the work "on file in the office of the department of public works," within the meaning of those words as used in the written contract between the city and Sexton; and having so held, other questions not pertinent in the view held by the Superior Court upon the former trial, arose during the progress of the trial, and were ruled upon by the court.

We entirely concur in the ruling of the Superior Court on the first ground urged for a reversal of the judgment below, which is, that that court erred in not holding that the contract between Sexton and the city is, by its terms, divisible, and that therefore a forfeiture of a part did not affect the residue. In our opinion, this construction of the contract is not admissible. The undertaking of Sexton is, "for and in consideration of the payments to be made, * * * to furnish, deliver, set up, place and fix complete all the iron work required in the erection of a building for a city hall," etc.; and the undertaking of the city is "to pay to said party of the

first part, when this contract shall be wholly carried out and completed on the part of said contractor, and when said work shall have been accepted by said mayor, the sum of $105,-302.69." It is true the amount is made up by stating the estimated cost of each story separately, and the roof, and then adding the whole together; but this was, evidently, merely for the purpose of furnishing the data upon which the estimate was made, for there is nowhere any agreement to receive and pay for the work by stories. On the contrary, it has been seen payment is to be made of the aggregate amount when the contract shall be wholly carried out. The provision authorizing estimates to be made is conditional upon the rate of progress of the work being satisfactory to the mayor. But the language in nowise limits the estimates by the stories, and it expressly provides that fifteen per cent of the estimates shall be reserved, not until the completion of the work on the story on which the estimates are made, but until the "final completion and acceptance of said work." The power to declare a forfeiture, given to the mayor by the contract, is not an arbitrary power, to be exercised by him capriciously, but it is, in its nature, judicial, and can be only exercised when acting in good faith and for reasonable cause, and then its exercise is not limited to stories. It may be for the part of a work on a given story as well as for the whole of the work on a story. We are clear in the opinion that the contract is an entire one, in which the consideration for each undertaking is the consideration for every undertaking, and in which the benefits presumed to result from the performance of the entire contract, instead of benefits presumed to result from the performance of separate parts of the contract, were in anticipation.

But upon the next ground urged for a reversal of the judgment below, the law is, in our opinion, with appellant. The Superior Court was asked to hold, but refused to do so, that so far as materials were furnished and work done under the

special contract, the price therefor must be governed by its stipulations, and proceeded to hear evidence and render judgment for the value of such materials and work, entirely disregarding the stipulations of the contract. The same question was directly before this court in *Folliott* v. *Hunt*, 21 Ill. 654, in *Evans* v. *Chicago and Rock Island Railroad Co*. 26 id. 189, *Holmes* v. *Stummel*, 24 id. 370, and in *Dobbins* v. *Higgins*, 78 id. 440, and it was held that, in cases like the present, so far as the work is done and materials furnished, to recover for which the suit is brought, under a special contract, its stipulations must govern as to the value of such work and materials. The question was not before us in *Lincoln* v. *Schwartz*, 70 Ill. 134, nor in *Cook County* v. *Harms*, 108 id. 151. In the first named of these cases the rule was recognized that the special contract affords the rule of damages, so far as it can be traced or followed, but it was held that, under the evidence, it did not appear that the judgment would have been any more favorable to the appellant had the correct rule been adopted, than it was under the rule laid down in the instruction, and that therefore there was not such error as would authorize a reversal. In the other case, the only question having any apparent analogy was what was to be regarded as within the meaning of the terms "changes, additions and alterations," as used in the contract; and we held that any material departure from the plans and specifications, resulting in a new and substantially different undertaking, could not be regarded as within their meaning, and that the contractor, in case of such material and substantial change, is not limited or governed by the original contract as to his compensation for the work. In that case, the work was not done under or pursuant to the terms of the contract, but entirely beyond and outside of its terms.

This question was not before us when the case was here before. It is undoubtedly true, as stated by the judge of the Superior Court in giving his reasons for his rulings, that

in the opinion then filed it was said: "Whether the city, under the circumstances, was estopped from denying the correctness of the plans thus furnished appellant, and for that reason had no right to declare a forfeiture of the contract, or whether, by reason of a mutual mistake, caused by the negligence of the city, as to the subject matter of the contract, no contract was created between them, it is not important to inquire, as in either case the law is with the appellant, and he therefore had the right to acquiesce in the forfeiture of the contract, and proceed, as he did, upon a *quantum meruit* for the materials and his services." And if the case had been one wherein the court would have been authorized to find, under the evidence, that no contract was, in fact, created between the parties, of course then there would have been no terms of contract to apply to the value of the labor and materials. But the court did not then find, nor would it have been authorized to have found, that there was no contract between the plaintiff and the defendant, and, as the present record is understood, there is really no question as to the existence of a contract. An instrument in writing, expressing the mutual undertakings and obligations of the parties, was signed by appellee and those authorized to represent appellant. This constituted some kind of a contract between the parties, and in an action at law growing out of it, it was for the court to declare its legal effect. If through fraud, accident or mistake, material matters were omitted, or the minds of the contracting parties, in fact, never came together, the remedy was in equity, to rectify and reform, or rescind and cancel, the contract. *Mercantile Insurance Co.* v. *Jaynes et al.* 87 Ill. 200; *Andrus et al.* v. *Mann,* 92 id. 40; Bispham's Principles of Equity, (2d ed.) sec. 468, p. 515.

It was claimed by the present appellee, who was the appellant then, that the plans or tracings furnished him by those in charge of the office of the department of public works, upon which to make estimates for his bid or proposals, and, after-

wards, to work by, were to be construed and read as part of the contract, while the present appellant, who was the appellee then, denied this, and claimed that, instead of such plans or tracings, certain other plans or tracings, spoken of by the. witnesses as "originals," and on file in the office of the department of public works, were to be construed and read as part of the contract. That one or the other of these should be so construed and read, was settled by the language of the contract, and we held that it should be the former. It was very true, as said in the opinion, that in any view, whether there was a contract or not, there might be a recovery under a *quantum meruit* and a *quantum valebant* for the value of the labor performed and materials furnished, but the remark was unnecessary, and not intended as a declaration that there was, in fact, no contract proven. A contract was proven then, and is now proven, and the value of the work done and materials furnished must be fixed by the stipulations of that contract, so far as they can be applied. In all other respects the rulings below are, in our opinion, free of objection.

The question of estoppel was settled by the former opinion. The propositions of law held by the Superior Court in this respect are somewhat strained. They seem to go beyond any decision of this court, and, as we conceive, they go beyond what the case requires for its decision. But if, in the rather extreme hypothesis contemplated in the propositions held by the court, the court was of opinion that the city would have been estopped, much more must the court have been of opinion that the city was estopped upon the facts actually before the court, as disclosed by the record; and so it must follow that any error in that ruling was harmless. We hold, simply, that a municipal corporation may be estopped by the action of its proper officers, when the corporation is acting in its private, as contradistinguished from its governmental, capacity, and has lawful power to do the act. Here, the city had power to make a contract to do the work, and furnish the materials,

done, and furnished by Sexton. It owed the duty to prepare and furnish him with accurate plans and tracings. It had an office where these were to be kept, but, of necessity, that office was to be in charge of some one with power to preserve the maps, tracings, etc., and hand them out for the inspection of those interested. It could not be allowed that everyone desiring to examine the plans and tracings should be permitted to enter the office and hunt and select for himself. The city owed the duty to have a competent person in charge of this office, and to see that he discharged his duty. His act in selecting and handing out plans and tracings was its act. There is nothing new in thus holding a municipality responsible for the want of fidelity of those who act for it. Suits of that kind are of daily occurrence. The liability thus imposed is not within the constitutional and statutory limitations in regard to the creation of indebtedness.

For the error in regard to the measure of damages, the judgments of the Appellate and Superior Courts are reversed, and the cause is remanded to the Superior Court for further proceedings consistent with this opinion.

*Judgment reversed.*